CHARLES R. SCHWAB AND HELEN O. SCHWAB, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Schwab v. Commissioner
Docket No. 5297-90
United States Tax Court
T.C. Memo 1994-232; 1994 Tax Ct. Memo LEXIS 230; 67 T.C.M. (CCH) 3004; May 25, 1994, Filed *230 For petitioners: Alan R. Seher. For respondent: Allan D. Hill. DAWSON, WOLFE
DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: This case was assigned to Special Trial Judge Norman H. Wolfe pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183. [1] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE WOLFE, Special Trial Judge: Respondent determined the following deficiencies in and additions to petitioners' Federal income taxes and additional interest as follows: Additions to Tax and Additional Interest
Sec.
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)
6653(a)(2)
6659
6661
6621(d)
1982
$ 64,754
$ 3,238
[1]
$ 11,688
$ 6,448
[2]
1983
366,756
18,338
[1]
38,725
59,418
[2]
1984
69,546
3,477
[1]
12,362
7,085
[2]
1985
33,507
1,675
[1]
9,824
-- [2]
1986
101,249
[3] 5,062
[1]
16,042
-- [2]
*231 After concessions by the parties, the sole issue for decision is the fair market value on December 30, 1983, of an agricultural open-space conservation easement donated to American Farmland Trust (AFT) by Casa de Patos, a partnership in which Charles R. Schwab (petitioner) owned a 50-percent interest. At trial, petitioners moved for the burden of proof to be shifted to respondent. For reasons stated below, we deny petitioners' motion. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulated facts and attached exhibits are incorporated by this reference. Petitioners resided in Atherton, California, at the time the petition was filed. During 1983, petitioner and Jay A. Kellett each held a 50-percent interest in a general partnership named Casa de Patos (CP). On September 25, 1983, Casa de Patos entered into an agreement with C. William Johnson (Johnson) by which the partnership purchased the following specific rights to a 1,558-acre tract of land in Glenn County, California: (a) The exclusive right to use, improve, develop, and occupy that portion of said property consisting of one (1) acre more or less as described on Exhibit "B" attached *232 hereto and incorporated herein by reference [exhibit omitted]; (b) The exclusive right to fish and take game pursuant to Civil Code § 802 together with all rights necessary for the use and enjoyment thereof upon said property and all necessary and related easements and rights of access over and across said property for the full utilization of said right to fish and take game; (c) The right to make reasonable use of all water facilities located upon said property, including but not limited to the canals, ditches, pumps, weirs, and any other facilities which are part of the water distribution system upon said property; provided, however, the use thereof shall not conflict with the farming rights retained by Seller as described in Section 5.01 below. Buyer shall pay all electrical and power charges attributable to its use of said water distribution system and shall be responsible for all maintenance that arises as a result of such use. All capital replacement costs with respect to any pumping facilities, pumps and pipes used in connection with said pumps shall be paid ten percent (10%) by Buyer and ninety percent (90%) by Seller. (d) The right to use the existing airstrip *233 located on said property so long as Seller maintains said airstrip. In the event Buyer utilizes said airstrip Seller shall be provided with proof of insurance for such use which shall name Seller as an additional insured. Buyer shall further pay such portion of the maintenance costs thereof as is required by its use thereof; (e) In furtherance of the foregoing rights, all necessary rights of ingress, egress, and access over and across said property, including but not limited to the right to use and improve roads, to flood and/or drain said property, construct structures, sheds and blinds for the convenient use of the rights described in subparagraphs (a) through (d) above, provided the utilization of such rights shall not interfere with Seller's normal farming activities. (f) The exclusive right to restrict, limit or prevent any development, partition for development purposes, improvement or subdivision for development purposes of said property, whether commercial, industrial or residental [sic] in nature, together with the exclusive right to sell, convey or transfer such rights and to receive consideration for such rights in connection with any proposed development and/or *234 subdivision for development purposes of said property. [2]
CP specifically negotiated for the development rights. Petitioner entered into the transaction with a primary objective of arranging for conservation of the property in perpetuity. CP purchased the above-described rights for their fair market value of $ 1,075,000, which the purchase agreement allocated among the several rights as follows: (1) $ 10,000 for the 1-acre parcel; (2) $ 150,000 for the hunting and fishing rights; (3) $ 5,000 for reasonable water usage; (4) $ 5,000 for the right to use the airstrip; (5) $ 5,000 for the general ingress and egress easement; and (6) $ 900,000 for the development rights. In addition to transferring the above rights to CP, the agreement also restricted Johnson's use of his remaining property interests associated with the 1,558-acre tract by providing that there might be: (1) No development inconsistent with CP's rights; *235 (2) no construction or permanent structures; (3) no mining without the consent of CP; and (4) no strip or surface mining. Johnson was also restricted to farming operations related to crops compatible with waterfowl hunting. The agreement evidencing the sale to CP and restrictions on Johnson was recorded in the Glenn County Recorder's Office on October 4, 1983. On December 29, 1983, CP granted an agricultural open-space conservation easement on the Glenn County farmland to the American Farmland Trust (AFT), a D.C. nonprofit corporation qualified under sections 501(c)(3) and 170(h)(3). CP recorded the easement with the Glenn County Recorder on December 30, 1983. Respondent concedes that the interest in the subject property passed from the partnership to AFT during 1983 is a "qualified real property interest" within the meaning of section 170(h)(1)(A), that AFT is a "qualified organization" within the meaning of section 170(h)(1)(B), and that the "purpose" of the claimed contribution is within the meaning of section 170(h)(1)(C). Accordingly, respondent concedes that CP's donation of the agricultural open-space conservation easement was a "qualified conservation contribution" within *236 the meaning of section 170(f)(3)(B)(iii). The easement ensures that the property will be restricted in perpetuity for the purposes of conserving the land's open-space character and continued agricultural use and preserving the natural habitat of wildlife species, including waterfowl and pheasant. In general, the easement restricts the following activities with respect to the property: (1) Construction or placement of permanent structures on the property except the 1-acre parcel; (2) partition, subdivision, or improvement; (3) timber harvesting; (4) surface or strip mining; and (5) dumping or accumulating trash. When CP granted the easement, the real property restricted by the easement was used for the production of rice and had no improvements other than water pumps. The restricted property is located in the southeast corner of Glenn County, California, approximately 75 miles north of Sacramento and 150 miles northeast of San Francisco. The property's easterly boundary is Butte Creek which serves as part of the border of Butte County. At the time the easement was granted the property was located in the A-2 Agricultural District of Glenn County which only permitted one single-family *237 dwelling per twenty acres, limited to three houses per parcel. The government of Glenn County is committed to developing the economic growth of the county while preserving its rural character. The county has implemented the California Land Conservation Act. The area has a long history of wildlife conservation. Many wetland preserves, both governmental and private, exist for waterfowl. The Butte Sink National Wildlife Refuge, the Delevan National Wildlife Refuge, the Sacramento National Wildlife Refuge, the Colusa National Wildlife Refuge and the Grey Lodge State Wildlife Area all are near the property. Petitioners assert that the agricultural open-space conservation easement had a value of $ 900,000 on December 30, 1983. On their 1983 joint Federal income tax return they claimed a charitable contribution deduction with respect to the easement in the amount of $ 450,000 (petitioner's share, 50 percent, of CP's claimed charitable contribution deduction). Respondent disallowed the entire claimed charitable contribution deduction on the ground that the easement had no value at the time of the contribution. Both parties presented expert testimony and written reports of real estate *238 appraisers to support their valuations of the easement as of December 30, 1983. The opinions of the experts varied considerably as to the value of the agricultural open-space easement. Respondent's expert stated that the imposition of the easement did not result in any diminution in value of the property, and the easement, therefore, had no value. Both of petitioners' experts, however, placed great value on the easement. Valuation of Gregory A. House
Respondent relies upon the report and testimony of Gregory A. House (House) regarding the value of the agricultural open-space easement. In 1983, House founded House Agricultural Consultants (HAC) which appraises farms, manages farms and consults in farm management and economics. Prior to founding HAC, House was employed as a consulting agronomist for 6-1/2 years. He is an accredited rural appraiser and farm manager and a certified professional agronomist. Before appraising the subject property House had no experience or specific formal education in appraising conservation easements or development rights, and he had only appraised two fee simple properties in Glenn County, California. House visited the subject property before *239 making his determination of value. He did not rely upon the comparable sales method of real property valuation, because he believed that no comparable sales of conservation easements were available. Instead, he relied upon the before and after method. In applying the before and after method, House only considered the value of the entire fee simple interest in the 1,558 acres. He did not separately consider the bundle of rights which CP actually owned. House determined the fair market value of the entire fee simple interest before the easement was granted by applying two methods: (1) The sales comparison approach; and (2) the income approach. In applying the sales comparison approach, he considered five property sales comparable to the subject property. Based on those sales, House reported that the fair market value of a fee simple was $ 2,500 per acre or $ 3,895,000 for the subject property. House then applied the income approach and estimated a fair market value of $ 3,760,000 under this approach. He stated that the "typical cash rent" for the Colusa Basin area was $ 150/acre. In addition, he stated that the landlord expenses he used in his analysis were typical for the *240 area of the subject property. In House's view a fee simple interest in the property had a value of $ 3,850,000 before CP donated the agricultural open-space easement to AFT. With respect to the value of the fee simple after the easement was granted, House stated: The Highest and Best use of the subject property has not changed after imposition of the easement. The findings and opinion expressed in the previous pages in valuing the property before the easement remain the same. FINAL OPINION OF VALUE AS OF DECEMBER 30, 1983, AFTER THE EASEMENT:
$ 3,850,000 House determined that the easement had no value at the time it was granted because the fair market value of the fee simple based on the highest and best use of rice farming and recreational hunting remained unchanged. As an addendum to his report, House summarized a valuation of the development rights through hypothetical subdivision of the property into 20-acre tracts and sales of those tracts. House employed the value from this approach to support his conclusion that a combination of farming and hunting was the highest and best use of the property. Under the development approach, House concluded that the present *241 value of the cash flow generated by subdivision of the 1,558-acre tract into 20-acre lots was $ 77,107. He stated that because the income approach with farming and hunting as the activities on the property resulted in a present value higher than $ 77,107, the highest and best use of the property was a combination of farming and hunting activities. House did not consider the subdivision analysis to be a means of directly valuing the conservation easement. House made a number of assumptions in his one-page subdivision analysis. He assumed that 10 percent of the property would be used for public areas. Development costs of $ 400,000, all of which would be expended immediately, were factored into the analysis. He estimated a 1-year delay in selling any parcels. Thereafter 14 parcels would be sold each year. The sales price of each 20-acre lot was based upon a comparable sale which occurred on January 12, 1982. He assumed a 10-percent annual appreciation rate from December 30, 1983, until all of the sales were completed, along with a 10-percent capitalization rate for those years. At trial House agreed to characterization of the $ 77,107 as the value of the right to develop the *242 property, but he did not conclude that the easement was valued the same. He determined that development or subdivision was not the property's highest and best use and, therefore, disregarded his subdivision analysis. Valuation of Richard R. Fordiani
Richard R. Fordiani (Fordiani) has been involved in real estate appraisal and services and the property management business for 25 years. Before he appraised the subject property, Fordiani had experience in appraising development rights. Prior to 1983 he had been a member or manager of several duck clubs. While the other two experts prepared their reports in 1991 and 1992 in anticipation of this trial, Fordiani prepared his report in 1983. Petitioners relied upon Fordiani's report when claiming the charitable contribution deduction with respect to the agricultural open-space easement on their joint 1983 Federal income tax return. Fordiani visited the subject property before making his appraisal. He appraised the development rights in the property as of December 20, 1983, at $ 825,000. He decided that the property's highest and best use was farming or division into smaller farms of 20 to 40 acres. In Fordiani's view the value *243 of the easement equaled the fair market value of the CP's entire bundle of rights less the value of the "hunting and fishing rights". Fordiani considered both an income approach and a membership approach to value the hunting rights. Under the income approach he employed a capitalization rate of 13 percent and based anticipated income and expenses upon the income and expenses of similar waterfowl hunting clubs in the Butte Sink area. Under the membership approach he assumed sales of proprietary interests in a hunting club. First, Fordiani determined and discounted the anticipated income and expenses of CP's selling annual memberships in a duck club. He determined that 31 memberships could be sold at an annual sales price of $ 3,500 [3] each. Annual operating expenses were estimated at $ 30 per acre. After capitalizing the annual net income, he subtracted the costs to prepare the property for a hunt club: (1) $ 210,000 for a 6,000-square-foot clubhouse needed for kitchen and sleeping accommodations and (2) 31 four-man duck blinds at $ 650 each. Under this approach he concluded that the hunting and fishing rights had a value of $ 258,500. Applying the above formula, he calculated *244 a value of $ 816,500 for the easement. Next, he estimated and discounted the anticipated cash flow from CP selling proprietary interests in a duck hunting club. He estimated that 31 memberships would be sold for $ 15,000 each. From the total amount received, he then subtracted the cost of duck blinds (31 at $ 650 each) and the cost of a 6,000-square-foot clubhouse ($ 210,000). He calculated a value of $ 235,000 for the hunting and fishing rights and $ 840,000 for the easement under this method. Fordiani then chose a value between the two values he had determined for the easement and concluded that the easement had a value of $ 825,000. Valuation of Michael L. Evans
Michael L. Evans (Evans) has been a real estate appraiser and broker for 30 years. Prior to preparation of his report, he had extensive experience in appraising conservation easements and appraising *245 properties in the Glenn County area. Evans previously had appraised several duck clubs. He has been a hunter all of his life and hunted on the subject property long before he prepared the appraisal in this case. He considered the subject property to be in the best hunting country in California. Evans visited the subject property prior to making his appraisal. He had appraised the land in 1980 or 1981 for Johnson. Evans did not specifically state his opinion of the subject property's highest and best use on December 30, 1983, in his report. At trial, however, he testified that the highest and best use of CP's limited rights was hunting and fishing. Evans valued the easement by first determining the value of the hunting rights of the subject property. He then subtracted that value from the purchase price CP paid for their rights in the property to arrive at a value for the development rights. The hunting rights which Evans valued included the right to reasonable water usage and the general access easement over the entire property. Evans assigned no value to the 1-acre parcel of land for which CP had exclusive use or the use of the airstrip. Evans used the following three *246 methods to determine the value of the hunting rights on the subject property in his appraisal report: (1) The sales abstraction method; (2) an income approach; and (3) a membership approach. In applying the sales abstraction method and the membership approach, Evans considered comparable sales of combination farming and conservation easements in his appraisal. A combination farming and conservation easement prohibits both development and farming on the restricted property. Most of the comparable easement sales occurred during the years 1987 and 1988. Only two of the comparable sales occurred prior to CP's granting of the easement to AFT. Evans estimated that a conservation and farming easement over the entire property had a value of $ 3,110,000. In the sales abstraction method, Evans considered sales of fee simple interests in land comparable to the 1,558 acres. He placed a value of $ 4,050,000 on the entire fee simple interest as a result of his consideration of these comparable sales. He then subtracted the value of a conservation and farming easement over the property from the value of the fee simple interest to arrive at a value for the hunting and fishing rights of $ 940,000. *247 In the membership method, Evans reviewed sales of proprietary interests in duck clubs in the area of the subject property. He then determined the number of acres which each membership would cover, 20 acres, and the price at which each membership would sell, $ 55,000. He calculated the total income which would be generated by such membership sales less a 10-percent commission per sale, and discounted that total 1 year at a discount rate of 10 percent. After discounting the income stream from the sales, Evans subtracted the value of a conservation and farming easement over the land from the value of the fee simple and valued the hunting and fishing rights at $ 400,000. Evans also employed an income approach to value the easement. In this valuation, he based the annual anticipated income and expenses on information he obtained from managers and owners of hunting clubs in the Butte Sink area. He concluded that one 4-man blind for every 65 acres would be appropriate for a total of 24 blinds. Each blind would cost $ 4,000 per year for a member. The annual operating expenses were estimated at approximately $ 38 per acre. Eight dollars per acre was estimated for the salary of a *248 caretaker. In addition to annual income and expenses, Evans also estimated the costs needed to prepare the property for a hunting club. Included in those costs were: (1) Purchase and installation of duck blinds, $ 14,400; (2) a 6,000-square-foot clubhouse, $ 210,000; (3) a mobile home for a caretaker and a domestic pump and well for the clubhouse and the mobile home, $ 20,000; and (4) a shop or barn for storage of the hunters' vehicles, $ 40,000. After approximating all of these costs and expenses and applying a capitalization rate of 4 percent to the estimated annual net income, Evans concluded that the hunting and fishing rights which CP purchased from Johnson were worth $ 516,000. Evans used a purchase price for CP's original rights of $ 1,050,000 in his appraisal. The values for the agricultural open-space easement, under the Evans applications of the sales abstraction method, the membership method and the income approach, respectively, are $ 110,000, $ 650,000 and $ 534,000. Evans placed the most emphasis on the membership method. He placed the least reliance on the sales abstraction method. Evans determined that on December 30, 1983, the date it was granted, the conservation *249 easement donated to AFT by CP had a value of $ 550,000. ULTIMATE FINDING OF FACT The fair market value on December 30, 1983, of the agricultural open-space easement donated by CP to AFT was $ 544,000. OPINION The parties agree that an actual donation was made on behalf of petitioners to a charitable donee described in section 170(c). In addition, the parties have stipulated that donation of the agricultural open-space easement by CP to AFT is a qualified conservation contribution, so that a charitable contribution deduction is allowed to petitioners even though CP contributed less than its entire interest in the property. See sec. 170(f)(3)(A) and (B)(iii). To determine the allowable deduction under section 170(c) we must determine the fair market value of the donated property, the agricultural open-space easement. See Symington v. Commissioner, 87 T.C. 892, 894-895 (1986). Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs.
In the *250 notice of deficiency, respondent determined that the agricultural open-space easement had a value of zero on December 30, 1983. Normally respondent's determination of value would be presumed correct, and petitioners would have the burden of proving that respondent's determination of the value of the easement was incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). At trial, petitioners moved to have the presumption of correctness of the determination eliminated from the case and for the burden of proof to be shifted to respondent. While we agree that petitioners have rebutted the presumption of correctness, we also hold that petitioners retain the burden of proof with respect to the fair market value of the open-space conservation easement. The presumption of correctness is a procedural device which requires the taxpayer to come forward with enough evidence to support a finding contrary to respondent's determination. Rockwell v. Commissioner, 512 F.2d 882, 885 (9th Cir. 1975), affg. T.C. Memo. 1972-133. Petitioners introduced the testimony of Jim Berg, an attorney who negotiated *251 the original purchase of CP's rights in the property, which indicated that the development rights did, indeed, have value. In addition, petitioners introduced the expert testimony and reports of two real estate appraisers, both experienced in valuing development rights and conservation easements, which indicated that the easement had significant value. Respondent's expert admitted at trial that the easement had some value. He testified that given a choice between the exact same property rights encumbered by an agricultural open-space easement and property without easement at identical prices, a buyer would prefer the property without the easement. Petitioners have, therefore, rebutted the presumption of correctness of respondent's determination of value. Consequently, we must determine the value ourselves, based on all the evidence, without the benefit of any presumptions. See Estate of Sawade v. Commissioner, T.C. Memo. 1984-626, affd. 795 F.2d 45 (8th Cir. 1986). Petitioners argue that because the presumption of correctness has been overcome, the burden of proof shifts to respondent. Petitioners rely upon Cohen v. Commissioner, 266 F.2d 5 (9th Cir. 1959), *252 remanding T.C. Memo. 1957-172, in support of their position. In Cohen, the issue was whether or not the taxpayers had received income. In this case the issue concerns the proper amount of a claimed deduction. The Ninth Circuit Court of Appeals does not follow the Cohen case in cases involving deduction. Rockwell v. Commissioner, supra at 885-886; see Brumley-Donaldson Co. v. Commissioner, 443 F.2d 501, 504 n.4 (9th Cir. 1971), affg. T.C. Memo. 1969-183. In interpreting Cohen and similar cases, the Ninth Circuit stated in Rockwell v. Commissioner, supra at 886: Whatever the proper rule may be where inclusion in income is controverted, there is no dispute that the taxpayer bears the burden of proof in substantiating claimed deductions. * * *
Deductions are strictly a matter of legislative grace, and petitioners bear the burden of proving their entitlement to any deduction claimed on the return. INDOPCO, Inc. v. Commissioner, 503 U.S.    , 112 S. Ct. 1039 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). *253 This rule applies without regard to the presumption of correctness. Rockwell v. Commissioner, supra at 886. Where a taxpayer claims a deduction which is disallowed by respondent, the burden is on the taxpayer to prove the merit of the deduction. The shifting of that burden can be caused by the interjection of "new matter". Nor-Cal Adjusters v. Commissioner, 503 F.2d 359, 361 (9th Cir. 1974), affg. T.C. Memo. 1971-200. The burden of proof may also shift if respondent increases her deficiency, pleads affirmative defenses, asserts fraud and under other provisions of Rule 142 that are not applicable in this case. Respondent determined that petitioners were not entitled to any Federal income tax benefit by reason of the donation of the open-space conservation easement to AFT. In the deficiency notice respondent relied upon two alternate bases in disallowing a charitable contribution deduction: (1) The value of the easement was zero; and (2) CP could not grant an easement to restrict the use of property because the partnership did not own a fee simple to the property. At trial, respondent *254 conceded that the second basis for disallowance recited in her deficiency notice was incorrect, but respondent still maintains that the easement had no value on December 30, 1983. Respondent did not introduce a new issue by taking the position that the easement had no value on December 30, 1983. Accordingly, petitioners' motion to shift the burden of proof is denied, and they retain the burden of proof concerning the fair market value of the easement. Petitioners argue on brief that respondent's expert, House, was strictly an advocate for respondent's position rather than an independent expert, and, therefore, we should reject his report and testimony. We disagree. Although House did have access to respondent's internal appraisal of the subject property and respondent's counsel accompanied him on his inspection of the property, House's report and testimony do not indicate that he simply advocated respondent's position in valuing the conservation easement. House mechanically applied the before and after approach to a fee simple interest in the property to arrive at a valuation of zero. Although we disagree with House's appraisal, we do not find that his approach to valuation *255 of the subject property demonstrates that he acted as an advocate for respondent. This Court has recognized three accepted valuation techniques in the appraisal of real property: (1) The cost approach; (2) t he comparable sales approach; and (3) the income approach. Marine v. Commissioner, 92 T.C. 958, 983 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991). Each of the experts who submitted reports and testified in this case described these methods. All three approaches use comparable sales or estimated income and expense information to make direct comparisons to the subject property. a. The Cost Approach
The cost approach is based on the proposition that an informed purchaser would pay no more than the cost of producing, within a reasonable period of time, a substitute property with the same utility as the subject property. This method is sometimes referred to as the "replacement cost method" because it values the property based on the cost of replacing the land and buildings currently less an allowance for depreciation. b. The Comparable Sales Approach
The market data or comparable sales *256 approach involves comparisons of the subject property to similar properties sold in the same time frame and geographic area. This approach is based on the principle that the prudent purchaser would pay no more for a property than the cost of acquiring an existing property with the same utility. A number of sales are investigated in order to determine the value of the subject property. A discussion and analysis of the sales is provided, and adjustments are typically made for the date of sale, physical and economic characteristics and terms of sale or financing. This approach is applicable when an active market provides sufficient quantities of reliable data which can be verified from authoritative sources. c. The Income Approach
The income approach involves estimating anticipated gross income and expenses from the property. Expected net income from the property is discounted to present value through application of a capitalization rate to the expected income stream. The capitalization rate is the overall rate of return from an investment. Usually the capitalization rate used in appraisals is abstracted from sales of similar types of properties and equals net income from *257 the property divided by the sales price. The income approach is widely applied in appraising income producing properties. All of the experts who testified in this case agreed that neither the cost approach nor the comparable sales approach was applicable under the circumstances of this case. The cost method is inappropriate because the land was not significantly improved on the valuation date. The comparable sales approach is inapplicable because there was not an established market for agricultural open-space easements at the time CP granted the easement to AFT. Evans' report did contain data concerning sales of combination farming and conservation easements. He used information about those sales to abstract the value of the hunting rights but did not directly value the subject easement through comparison with those easements. The definition of fair market value in section 1.170A-1(c)(2), Income Tax Regs., is essentially a statement of the comparable sales method of property appraisal. Where, as in this case, comparable sales of conservation easements are not available, a recognized method of establishing the fair market value of a conservation easement is to measure the difference *258 between the fair market value of the subject property immediately before the easement was granted and the fair market value of the property after the easement was granted. Any decline in fair market value as a result of the easement represents the fair market value of the easement itself. Symington v. Commissioner, 87 T.C. at 895; sec. 1.170A-14(h)(3)(i), Income Tax Regs. This method of valuing property is known as the before and after method. Under the before and after method, property is valued by considering its highest and best use on the valuation date both before and after the easement is granted. Stanley Works v. Commissioner, 87 T.C. 389, 400 (1986). All three experts in this case used the before and after approach in valuing the agricultural open-space easement. House and Evans agreed that the highest and best use of a fee simple interest in the subject land was a combination of farming and use as a duck hunting club, but they disagreed as to the importance of this circumstance, because CP and, therefore, petitioners did not own a fee simple interest in the property in 1983. Accordingly, Evans did not even *259 state the highest and best use of a fee simple in the property in his report. At trial, however, he testified that the highest and best use of CP's limited rights was necessarily a duck hunting club. Such use precludes development. Respondent's expert, House, compared the value of a fee simple interest in the land before donation of the easement and the value of a fee simple interest in the land after CP donated the easement to AFT. Petitioners' experts, however, looked to the value of the bundle of rights which CP owned in applying the before and after test. They did not consider the value of a fee simple interest in the land because CP did not own such an interest. We have considered the testimony, including the written reports, of each of the three experts. We have given relatively little weight to House's testimony because, in our view, House's determination that the easement had no value whatsoever is untenable. In applying the before and after method House simply stated that the highest and best use of a fee simple interest in the land remained the same after donation of the easement and, therefore, the easement had no value. We reject House's conclusion that the conveyance *260 of the easement had no adverse effect on the fair market value of the subject property. We find it hard to imagine a prospective purchaser of a 1,558-acre parcel of land who would not have considered the restrictions of the open-space easement in determining the price. See Symington v. Commissioner, supra at 898. More importantly, the bundle of rights which CP acquired from Johnson surely was decreased by the transfer of the easement. Despite his conclusion that the conservation easement was worthless, House's report indicates that he found evidence of substantial value for the donated easement. House's report contained one sale of a 333-acre parcel of land which occurred on January 8, 1981. The seller of the parcel retained a life interest in the hunting rights and the right of ingress and egress to a hunting cabin. House valued the retained hunting rights at $ 300-400 per acre. If the hunting and fishing rights on the subject property had a value of $ 350 per acre, then the entire hunting and fishing rights on the property would be valued at $ 545,300 (1,558 acres x $ 350). Therefore, the value of the conservation easement would be $ 514,700. *261 [4]
An addenda to House's report (the subdivision analysis) indicates that the value of solely the right to develop the property was $ 77,107 on December 30, 1983. In the subdivision analysis, however, House made a significant calculation error: he failed to appreciate each acre of land at the assumed rate of 10 percent for 1984. At trial House stated that the value of one acre of a 20-acre parcel on December 3, 1983, was $ 3,400. He also testified that the assumed appreciation rate for all years after 1983 was 10 percent. House's subdivision analysis assumed that the first lots would not be sold until one year after the subdivision was begun, December 30, 1984. Therefore, the lots would appreciate 10 percent in 1984. House assumed that fourteen 20-acre parcels would be sold each year. Using all of House's assumptions, including appreciation *262 at a rate of 10 percent for 1984, each lot would sell for $ 3,740 on December 30, 1984. The right to develop, therefore, had a present value on December 30, 1983, under House's assumptions of $ 510,000. [5]
Considering the testimony of the other experts and the evidence from House, summarized *263 above, we conclude from the record as a whole that a willing buyer of the CP rights after the granting of the easement would pay less for such property than he would have paid before the granting of the easement, and a willing seller would sell the rights for less after encumbrance by the easement. The restrictions clearly affect potential use of the land and value of the remaining rights. Accordingly, we reject House's appraisal of the easement at zero. Because we have concluded that the easement necessarily had some value on December 30, 1983, we must next decide the value of the easement. The before and after method is a proper methodology in this case. The parties, however, disagree as to the proper application of this method. Respondent contends that the before and after method of valuing the easement must be applied with reference to the value of the fee simple in the 1,558 acres. Petitioners disagree and point out that at least during the period in issue petitioners did not hold a fee simple interest in the property. Consequently, in petitioners' view, variations in the value of the fee simple are irrelevant to the issue in this case. We agree. In this case petitioners, *264 through CP, acquired rights in a large tract of land primarily for conservation purposes. The rights include the right to prevent development and also hunting and fishing rights. Petitioner testified that he had learned to hunt as a boy but that during the time in issue he had little time for such activities. He testified that he had arranged for conservation easements in perpetuity on several large properties in Montana as well as the property in issue. Large wildlife refuge areas are located near the subject property. Petitioner testified that the property was equipped for only very limited hunting and recreational use, that he personally made little use of it for entertainment or recreation, and that to him "the major use of the land is a bird sanctuary." Petitioners reflected that view in their allocation of the purchase price. In essence petitioner's explanation of the transaction here is that he purchased rights in a large tract of land for conservation purposes, that he donated the development rights and made additional cash contributions to an appropriate organization to assure conservancy in perpetuity, and that he retained only limited rights for recreational use. *265 Petitioner's testimony was delivered in a clear and forthright manner. The record shows that in 1983 he was financially able to make substantial contributions of the type and scope in issue. There is no reason for us to disbelieve his explanation of his objectives in this transaction. The reports and testimony of petitioners' experts are consistent with petitioner's testimony concerning his objectives in acquiring rights in the property and then donating the conservation easement portion of those rights. Petitioners' experts both determined that the easement had substantial value. That valuation of the easement is consistent with evidence provided by House to the effect that the right to develop the area into 20-acre units was worth as much as $ 510,000 in 1983. Petitioners' experts both used the before and after method to value the conservation easement. In valuing the easement, they began with the fair market value of the bundle of rights purchased by CP. Both of petitioners' experts considered only the rights which CP owned. The "before" value, therefore, obviously was CP's purchase price, $ 1,075,000. The less obvious "after" value of CP's retained rights after donation *266 of the easement was the total of CP's retained rights consisting of the exclusive right to hunt and fish the property, regardless of the extend to which petitioners made use of those rights, the right to reasonable use of water, exclusive rights in a 1-acre parcel, and use of the airstrip. Both Evans and Fordiani valued CP's retained rights (after donation of the easement) by determining the value of the hunting and fishing rights. The "hunting and fishing rights" which Fordiani valued included all of CP's retained rights, except the right to use the airstrip. The term "hunting and fishing rights" in Evans' report included all of CP's rights except the right to use the airstrip and the exclusive right to use of the 1-acre parcel. To determine the value of the "hunting and fishing rights", Fordiani used an income approach and a membership approach. Evans used an income approach, a membership approach and a sales abstraction approach. An integral part of Evans' calculations under both the membership method and the sales abstraction method was the value of a combination farming and conservation easement over the land. Evans derived the value for such an easement by looking at *267 sales of such easements for the period of 1980-88. Evans admitted that there were "many unknowns in estimating the value of the farming and development rights." In addition he stated in his report: "there were very few sales of farming and/or conservation easements at the time the property was sold and the method of assigning these rights was at best very subjective." Evans disparaged his own valuation of a combination farming and conservation easement, but nevertheless utilized it in his applications of the sales abstraction method and the membership approach. As a result we have not relied on his computations by the sales abstraction or membership methods. Fordiani also used the membership approach to value the hunting and fishing rights. He estimated the cash flow from hypothetical sales of proprietary interests in a duck club. In Fordiani's view, a 50-acre membership would sell for $ 15,000. Fordiani gave no support for this figure in either his report or his testimony. He merely stated that a membership could be sold for $ 15,000 "keeping in mind, however, that this proprietary interest would not include any fee interest in the property." Because of the lack of support *268 for Fordiani's underlying figures, we have not relied on his valuation under the membership method. We find significant errors and omissions in the above valuation techniques, so we have relied on the experts' applications of the income approach for valuing the subject easement. All three experts utilized the income approach in their appraisals. The most profitable use of CP's limited rights in December 1983 was a duck hunting club. Each expert estimated the gross income and operating expenses from operation of such a club on the subject property. Each expert then capitalized the resulting estimated annual net income. From that amount they subtracted the expenditures necessary to prepare the property for operation of such a club. In making their computations the experts considered it irrelevant that petitioners were unlikely to operate a commercial duck club. We agree. Each of the experts arrived at differing numbers for gross income, operating expenses and costs to prepare the property for a hunt club (costs to cure). House gave no support for his estimates of gross income or operating expenses in his report. He testified that he spoke to approximately six people concerning *269 the estimated gross income and that he estimated the operating expenses based on his general knowledge of such expenses. Both Fordiani and Evans based their estimated gross income and operating expenditures on information supplied to them by owners and operators of duck hunting clubs in the Butte Sink area. Both of their reports contain information supporting their estimates. The main factor which differentiates the income analyses of Fordiani and Evans, and leads to a significant difference in their valuations of the easement, was the rate at which the estimated net income was capitalized. Fordiani used a rate of 13 percent, while Evans used a rate of 4 percent. Fordiani offered no support for his capitalization rate in his written report, but at trial he testified that he derived a 13-percent capitalization rate through use of the band of investment theory. Evans derived a capitalization rate of 12-14 percent using the band of investment theory, but he decided to utilize the direct sales comparison method to derive a capitalization rate instead of the band of investment theory. He looked at the capitalization rate from the sales of farmland, which indicated a capitalization *270 rate of 4 percent. Evans then offset the increase in capitalization rates due to the risk of hunting against the decrease in capitalization rates because of the recreational aspect of hunting, and concluded that a proper capitalization rate was 4 percent. We find Evans' method of deriving a capitalization rate more persuasive than Fordiani's methodology. Therefore, we conclude that a capitalization rate of 4 percent is appropriate. Evans offered support in both his report and his testimony for the estimated income, expenses and capitalization rate used in his income approach. He is an experienced real property appraiser with an extensive background of employment in Glenn County, California. In addition, he is a member of several hunt clubs and has hunted the subject property. We have no reason to doubt Evans' report or testimony concerning operation of a duck hunting club. We find the evidence of valuation by Evans more convincing than that of either Fordiani or House. In this case, we choose to accept the more persuasive expert valuation, that of Evans. See Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980). Although *271 we agree with Evans' underlying approach, we are not required to accord his valuation total acceptance. See Parker v. Commissioner, 86 T.C. 547, 562 (1986). A few adjustments are necessary for proper valuation of the easement. First, Evans used a "before" value of only $ 1,050,000 while the fair market value of CP's rights before donation of the easement was $ 1,075,000. In addition, Evans failed to take account of CP's exclusive rights to the 1-acre parcel and rights to use the airstrip. Because no evidence was presented on the fair market value of these rights, we accept the values given to these rights in the purchase agreement: $ 10,000 for the 1-acre parcel and $ 5,000 for use of the airstrip. The value of the agricultural open-space conservation easement is therefore $ 544,000, calculated as follows: CP's rights before donation
$ 1,075,000 Less CP's rights after donation:
1-acre parcel
$ (10,000)
Right to use airstrip
(5,000)
Hunting and fishing rights
(516,000)
(531,000)
Value of Conservation Easement
$ 544,000 Valuation is not an exact science and cannot be determined with mathematical precision. *272 It is a subjective determination which requires the exercise of our best judgement considering all the facts and circumstances of record. Messing v. Commissioner, 48 T.C. 502, 512 (1967). Based on Evans' appraisal, as well as the record as a whole, we conclude that the fair market value of the easement granted by petitioners to AFT on December 30, 1983, was $ 544,000. Accordingly, petitioners are entitled to a charitable contribution deduction under section 170(a)(1) in the amount of $ 272,000. To reflect concessions by both parties, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the tax years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence.↩
2. The annual rate of interest under sec. 6621(d) for interest accruing after December 31, 1984, equals 120 percent of the interest payable under sec.6601 with respect to any substantial underpayment attributable to tax-motivated transactions.↩
3. For the taxable year 1986, the additions under both sec. 6653(a)(1)(A) and 6653(a)(1)(B) apply.↩
2. The rights described in subparagraph (f) are referred to as the development rights hereafter.↩
3. In his report he states that each membership would sell for $ 3,000, but in his calculations he uses a sales price of $ 3,500 per membership.↩
4. ↩
CP's Bundle of Rights
$ 1,075,000 Hunting and Fishing Rights
(545,300)
1-acre Parcel
(10,000)
Use of Airstrip
(5,000)
Value of Conservation Easement
$   514,700 5. The present value of the right to develop the property is calculated below: Date
Description
Cash Flow Present Value The numbers in this column are the present value of the cash flow on December 30, 1983, discounted at 10 percent a year.
[1]
12/30/83
Investment 1,558 acres at $ 2,500 per acre.
[2]
$ (3,850,000)
$ (3,850,000)
Development Costs
(400,000)
(400,000)
12/30/84
14 lots Each lot is 20 acres.
[3]↩ at $ 3,740/acre
1,047,000 952,000 12/30/85
14 lots at $ 4,114/acre
1,151,920 952,000 12/30/86
14 lots at $ 4,525/acre
1,267,000 952,000 12/30/87
14 lots at $ 4,978/acre
1,393,840 952,000 12/30/88
14 lots at $ 5,476/acre
1,533,280 952,000 Total
$  2,143,040 $    510,000