T.C. Memo. 2009-94


UNITED STATES TAX COURT



NICK R. HUGHES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 6395-06.                    Filed May 6, 2009.



        P granted a conservation easement to a qualified
conservation organization and claimed a $3,100,000
charitable contribution deduction on his 2000 Federal
income tax return.  R determined a deficiency on the
basis that P overstated the amount of his charitable
contribution by $1,107,625.

        <u>Held</u>:  P is liable for the deficiency.



<u>Joseph H. Thibodeau</u> and <u>Vincent M. Lane</u>, for petitioner.

<u>Sara J. Barkley</u> and <u>Tamara L. Kotzker</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, Judge:  On December 28, 2000, petitioner granted a conservation easement to the Valley Land Conservancy, a Colorado nonprofit corporation locally referred to, and doing business under a filed trade name, as the Black Canyon Regional Land Trust, Inc.[1]  He claimed a $3,100,000 charitable contribution deduction on his 2000 Form 1040, U.S. Individual Income Tax Return, for doing so.  In a February 7, 2006, notice of deficiency respondent disallowed $1,107,625 of the deduction, resulting together with some other small adjustments[2] in the determination of an alleged $437,153 Federal income tax deficiency for petitioner's 2000 tax year.  This case is before the Court on a petition for redetermination of that deficiency. The issue for decision is the amount of petitioner's charitable contribution for Federal income tax purposes.

---

[1]See Colo. Rev. Stat. sec. 38-30.5-102 (2000); see also sec. 1.170A-14(a), Income Tax Regs. ("A qualified conservation contribution is the contribution of a qualified real property interest to a qualified organization exclusively for conservation purposes.").

[2]Respondent also determined that petitioner had $3,503 of unreported interest income, $401 of unreported dividend income, and $10 of "other income", and that a $118 itemized deduction limitation adjustment to Schedule A, Itemized Deductions, was necessary.  Petitioner has conceded these issues.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts and accompanying exhibits are hereby incorporated by reference into our findings.  At the time he filed his petition, petitioner resided in Colorado.

Petitioner granted the conservation easement at issue over two nearby properties:  A 1,950-acre property referred to by the parties as the Bull Mountain parcel and a 463.35-acre property referred to by the parties as the Sylvester parcel.  Both parcels are in a mountainous region in Gunnison County, Colorado, approximately 18 miles northeast of Panonia, Colorado.  The properties' elevation ranges from approximately 6,900 feet to 8,185 feet above sea level.

Gunnison County is approximately 3,260 square miles in size, making it about twice the size of Rhode Island.[3]  The U.S. census for 2000 indicated a population of 13,956, which results in an overall population density of 4.3 people per square mile.[4]  In 2000 approximately half of the county's population was in the city of Gunnison and the town of Crested Butte, which together

_____

[3]U.S. Census Bureau, United States Summary:  2000-- Population and Housing Unit Counts 29 (2004); see United States v. Bailey, 97 F.3d 982, 985 (7th Cir. 1996) (taking judicial notice of census information with respect to life expectancy).

[4]U.S. Census Bureau, Colorado:  2000--Population and Housing Unit Counts 8 (2003).

constituted less than 4 square miles.[5]  The census also found that the 673.51-square-mile area in which the Bull Mountain and Sylvester parcels are located has a population of 488, resulting in a population density of less than 1 person per square mile.[6] The Federal Government owns much of the county's land.

The Bull Mountain and Sylvester parcels lie southwest of the intersection of the two public roads that service their immediate area:  State Highway 133 (north-south) and County Road 265 (east-west).  County Road 265 dead-ends at its intersection with State Highway 133.  The Sylvester parcel abuts County Road 265, commonly known as Buzzard Divide, on its northern border.  The Bull Mountain parcel is located south of the Sylvester parcel and is separated from it by a 1/4-mile-wide strip of property owned by an unrelated third party.  The Bull Mountain parcel does not abut either of the two roads.

Property in the area has historically been used for agricultural purposes with some isolated residential use.  The Bull Mountain and Sylvester parcels have historically been used for cattle ranching and recreational purposes.

---

[5]Id.

[6]Id.

## I.  The Bull Mountain Parcel

The Bull Mountain parcel features rolling, brush-covered hills and two permanent streams.  A national forest borders the parcel to the west, and views of the Ragged Mountains are available to the north and east.  Petitioner purchased the parcel from Million Agricultural Investment, Ltd. (Million), on October 6, 1999, for $1,535,000 or $787 per acre.

When petitioner purchased the Bull Mountain parcel, it did not have direct access to either State Highway 133 or County Road 265.  However, petitioner could use access easements that had been acquired by previous owners of the parcel to travel to and from both roads.

To access State Highway 133, petitioner could use an easement along a road through property owned by the Theodore R. Eck Trust (Eck), petitioner's neighbor to the east.  To access County Road 265, petitioner could use two easements along the Narrows Road, which runs north from the parcel through property owned by Spadafora Ranches, Inc. (Spadafora), and continues northeast through property owned by McIntyre Livestock Corp. (McIntyre).  The easement over McIntyre's property was limited to agricultural use.[7]

---

[7]The parties dispute whether the easement over Spadafora's property was also limited to agricultural use.  To resolve the issue, petitioner attempted to introduce at trial a document dated Apr. 14, 1978, in which Spadafora granted McIntyre--which

(continued...)

## II.  The Sylvester Parcel

The Sylvester parcel is essentially an irregular, long, brush-covered ridge, which, like the Bull Mountain parcel, has views of the Ragged Mountains to the north and east.  Petitioner purchased the Sylvester parcel from Gerald and Connie Rentz on September 18, 2000, for $671,350 or $1,449 per acre.

The Sylvester parcel had direct access to County Road 265 along its northern border.  In addition, petitioner could use easements acquired by the previous owner to travel to and from

---

[7](...continued)
owned the Bull Mountain parcel at the time--and McIntyre's successors and assigns forever an unrestricted access easement over Spadafora's property.  Respondent objected to the admissibility of the document on the basis that petitioner did not provide a copy to respondent at least 14 days before trial, as required by the Court's standing pretrial order.  We reserved judgment on the issue.

Despite respondent's objection, we will admit the document into evidence.  First, the Gunnison County Clerk and Recorder has certified the document as a "true and exact copy" of a document recorded in Gunnison County's publicly available real estate records.  As such, we can take judicial notice of it.  See Joseph v. U.S. Civil Serv. Commn., 554 F.2d 1140, 1147 n.12 (D.C. Cir. 1977); see also Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946 (10th Cir. 2001); see also sec. 7453; Fed. R. Evid. 201; Rule 143(a).  Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure.  Second, on the record before us we cannot conclude that respondent was prejudiced by not receiving the document at least 14 days before the trial.  See Freije v. Commissioner, 125 T.C. 14, 16 n.2 (2005).

In any event, the language in the document is vague and does not totally resolve the issue.  Moreover, as we will see, petitioner's access over Spadafora's property is inconsequential to our ultimate conclusion.

County Road 265. An easement over Spadafora's property permitted petitioner to travel west from the parcel to the Narrows Road and then to travel north along the road to McIntyre's property. Another easement permitted him to continue northeast along the Narrows Road through McIntyre's property. Neither of these easements was restricted to any particular use.

The Sylvester parcel's access easements mostly overlapped the Bull Mountain parcel's easements with two exceptions: (1) The Sylvester parcel's easement over Spadafora's property did not permit petitioner to travel south along the Narrows Road to the Bull Mountain parcel and (2) the Bull Mountain parcel's easement over Spadafora's property did not permit petitioner to travel east to the Sylvester parcel.

III. The Conservation Easement

In a December 28, 2000, "Deed of Conservation Easement In Gross", petitioner granted the Valley Land Conservancy the development rights, "as defined by section 2031(5)(D) [sic] * * * except as specifically reserved herein",[8] over the Bull Mountain and Sylvester parcels. As a result, petitioner and "his successors and assigns forever" were prohibited from, among other things, subdividing the parcels, constructing buildings or other

_____

[8]All section references are to the Internal Revenue Code of 1986, as amended an in effect for the tax year at issue. There is no sec. 2031(5)(D) in the Internal Revenue Code, however. For the purposes of this case we shall assume the intended reference was to sec. 2031(c)(5)(D).

structures except for a single-family residential dwelling on each parcel, and using the parcels for any commercial, residential, or industrial uses not specifically permitted. The deed refers to the Bull Mountain and Sylvester parcels as "two legally distinct and separately deeded properties".

In connection with preparing and filing his 2000 Federal income tax return, petitioner engaged Appraisal Associates of Colorado, Inc., and its coowner, Pamela M. Sant, to appraise the conservation easement. Ms. Sant is a Residential Member of the Appraisal Institute and a Certified General Appraiser licensed by the State of Colorado. She prepared an appraisal report, dated March 2, 2001, in which she determined that the combined value of the Bull Mountain and Sylvester parcels was $4,100,000 before petitioner granted the easement and $1 million after. She concluded that the amount of the charitable contribution was therefore $3,100,000 and to that effect signed an IRS Form 8283, Noncash Charitable Contributions, which petitioner attached to his return.

On February 7, 2006, respondent sent petitioner a notice of deficiency. Respondent disallowed $1,107,625 of the charitable contribution deduction and determined that petitioner was liable for a $437,153 Federal income tax deficiency. On April 3, 2006, petitioner filed a timely petition with the Court. Among other things, he argues that respondent has incorrectly determined that

he is not entitled to the full $3,100,000 deduction.  A trial was held on November 1-2, 2007, in Denver, Colorado.

OPINION

I.  Applicable Law

Under section 170(a), a taxpayer may claim a deduction for any charitable contribution, including a qualified conservation contribution, made within the taxable year.  Sec. 170(c), (f)(3)(B)(iii), (h).  The parties agree that petitioner's grant of the conservation easement over the Bull Mountain and Sylvester parcels was a qualified conservation contribution under section 170(h) and that he is entitled to a deduction under section 170(a).  The only issue before us is the amount of the charitable contribution and thus the allowable deduction.

Deductions are a matter of legislative grace, and a taxpayer bears the burden of proving entitlement to any claimed exemptions or deductions.  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).  Moreover, the Commissioner's determination of value is normally presumed correct, and the taxpayer bears the burden of proving that the determination is incorrect.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Schwab v. Commissioner, T.C. Memo. 1994-232.

Generally, the amount of a charitable contribution is the fair market value of the contributed property at the time it is contributed.  Sec. 1.170A-1(a), (c)(1), Income Tax Regs.  Fair

market value is the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts. Sec. 1.170A-1(c)(2), Income Tax Regs.

In determining the fair market value of property, we must take into account not only the current use of the property but also its highest and best use. See Stanley Works v. Commissioner, 87 T.C. 389, 400 (1986); sec. 1.170A-14(h)(3)(i) and (ii), Income Tax Regs. A property's highest and best use is the highest and most profitable use for which it is adaptable and needed or likely to be needed in the reasonably near future. Olson v. United States, 292 U.S. 246, 255 (1934). The highest and best use can be any realistic, objective potential use of the property. Symington v. Commissioner, 87 T.C. 892, 896 (1986).

The amount of a charitable contribution of a conservation easement is generally the fair market value of the easement at the time it is contributed. Sec. 1.170A-14(h)(3)(i), Income Tax Regs. Ideally, the fair market value of a conservation easement would be based on the sales prices of comparable easements. Sec. 1.170A-14(h)(3), Income Tax Regs. However, because conservation easements are typically granted by deed or gift rather than sold, comparable sales are rarely available. Symington v. Commissioner, supra at 895. As an alternative, the so-called

before-and-after approach is often used instead. Stanley Works v. Commissioner, supra at 399. Under the before-and-after approach, the fair market value of a conservation easement equals the difference between the fair market value of the easement-encumbered property before it is encumbered by the easement and after. Sec. 1.170A-14(h)(3)(i) and (ii), Income Tax Regs.

The general rule for determining the amount of a charitable contribution is modified in some situations where appreciated property is contributed. Under section 170(e)(1)(A), the amount of a charitable contribution of property is reduced by the amount of gain which would not have been long-term capital gain had the taxpayer sold the property at its fair market value at the time of contribution. Estate of Bullard v. Commissioner, 87 T.C. 261, 268 n.4 (1986); sec. 1.170A-4(a)(1), Income Tax Regs. Long-term capital gain is generally "gain from the sale or exchange of a capital asset held for more than 1 year". Sec. 1222(3). In effect, section 170(e)(1)(A) limits the contribution amount of appreciated property which is not long-term-capital gain property to the property's basis at the time it was contributed. See Lary v. United States, 787 F.2d 1538, 1540 (11th Cir. 1986); Jones v. Commissioner, 129 T.C. 146, 150-151 (2007), affd. 560 F.3d 1196 (10th Cir. 2009).

It follows that when a taxpayer grants a conservation easement over appreciated real property held for less than 1

year, the amount of the contribution must be determined with regard to section 170(e)(1)(A).  See sec. 1.170A-4(b)(1), Income Tax Regs.; see also Strasburg v. Commissioner, T.C. Memo. 2000-94; Griffin v. Commissioner, T.C. Memo. 1989-130, affd. 911 F.2d 1124 (5th Cir. 1990).  Accordingly, the amount of the contribution is limited to the conservation easement's basis at the time it is contributed.  See Strasburg v. Commissioner, supra; Griffin v. Commissioner, supra.

The adjusted basis of a conservation easement is equal to that portion of the adjusted basis of the entire property which bears the same ratio to the adjusted basis of the entire property as the fair market value of the contributed property bears to the fair market value of the entire property.  Sec. 1.170A-4(c)(1)(ii), Income Tax Regs.; see Strasburg v. Commissioner, supra.  Put another way, the basis of a conservation easement is equal to the adjusted basis of the entire property reduced by the percentage decrease in the entire property's fair market value as a result of the conservation easement.

II.  Expert Witnesses

Each party has offered the report and testimony of an expert witness to establish the amount of petitioner's charitable contribution.  An expert's opinions are admissible if they assist the trier of fact to understand the evidence or to determine a fact in issue.  Fed. R. Evid. 702.  We evaluate expert opinions

in light of each expert's demonstrated qualifications and all other evidence in the record. See Parker v. Commissioner, 86 T.C. 547, 561 (1986). Where experts offer competing estimates of fair market value, we determine how to weigh those estimates by, inter alia, examining the factors they considered in reaching their conclusions. See Casey v. Commissioner, 38 T.C. 357, 381 (1962). We are not bound by an expert's opinions and may accept or reject an expert opinion in full or in part in the exercise of sound judgment. See Helvering v. Nat. Grocery Co., 304 U.S. 282, 295 (1938); Parker v. Commissioner, supra at 561-562. We may also reach a determination of value based on our own examination of the evidence in the record. Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285.

A. Petitioner's Expert

Petitioner's expert, Mark S. Weston, has a bachelor of arts degree in English literature and a master of arts degree in library and information science. He is a certified general appraiser in the State of Colorado and has been a member of the Colorado Board of Real Estate Appraisers since 1999. Since the mid-1990s he has written several publications and given a number of presentations on valuing conservation easements. Mr. Weston wrote two appraisal reports with respect to the conservation easement over the Bull Mountain and Sylvester parcels: An

original report, dated March 30, 2001, and a supplemental report, dated September 28, 2007.

In his reports Mr. Weston used the before-and-after approach and concluded that the fair market value of the conservation easement was $2,926,700. He determined that the fair market values of the Bull Mountain and Sylvester parcels, before petitioner granted the easement, were $3,509,568 and $832,752 (both $1,800 per acre[9]), respectively. Referring to section 170(e)(1)(A) and the fact that petitioner purchased the Sylvester parcel less than 1 year before he granted the easement, Mr. Weston used the Sylvester parcel's adjusted basis, $671,350, in his calculations instead of its fair market value. In addition, he rounded the Bull Mountain parcel's fair market value to $3,509,650, resulting in a total before figure for both parcels of $4,181,000. He then determined that this figure was reduced by 70 percent when petitioner granted the easement.

---

[9]In his original report--in the narrative section on p. 44-- Mr. Weston twice stated that the value of the Bull Mountain and Sylvester parcels was "at the average rate of $1,900 per acre." However, he used $1,800 per acre in his subsequent numerical calculations and also referred to the $1,800-per-acre figure in his supplemental report. Because his report does not explicitly explain how he calculated the average value per acre of the two parcels, we cannot be certain which figure Mr. Weston intended. While this discrepancy on such an important fact is not comforting, we will assume that his references to $1,900 per acre were typographical errors.

B.  Respondent's Expert

Respondent's expert, Kerry L. Packard, has bachelor of science and a master of engineering degrees.  He has been an engineer revenue agent with the Internal Revenue Service since 1982.  In that role he has conducted field investigations and has made value estimations with respect to real and personal property and has prepared valuation, technical, and engineering reports. He has experience valuing conservation easements and ranch land and has completed several American Institute of Real Estate Appraisal courses.

In his report, dated September 28, 2007, he also used the before-and-after approach and concluded that the fair market value of the conservation easement was between $0 and $238,135.[10] He further determined that the fair market values of the Bull Mountain and Sylvester parcels before contribution of the easement were $1,706,250 ($875 per acre) and $671,350 (rounded to $1,449 per acre), respectively.  Mr. Packard referenced section 170(e)(1)(A), but because he found that the Sylvester parcel did not appreciate after petitioner purchased it, he concluded that it did not apply.  He rounded the fair market value of the Bull Mountain parcel to $1,710,000, resulting in a total before figure for both parcels of $2,381,350.  He then determined that this

---

[10]Respondent has not asserted an increased deficiency in light of Mr. Packard's conclusions.

figure was reduced by 0 to 10 percent when petitioner contributed the easement.

C.  Expert Witness Issues

The parties have raised two issues with respect to the expert witnesses.  First, the probative value of both experts' reports and testimony has been called into question.  Petitioner asserts that Mr. Packard is biased,[11] lacks appropriate qualifications, made numerous mistakes, and did not prepare his report in accordance with the Uniform Standards of Professional Appraisal Practice (USPAP).  Petitioner also argues that we should give Mr. Packard's report less weight because respondent did not assert an increased deficiency in light of Mr. Packard's conclusions.  Respondent counters that Mr. Weston is biased[12] and made numerous mistakes.  We have considered the parties arguments and, as appropriate, have evaluated the experts' reports and testimony accordingly.[13]  We do not find that Mr. Packard's

_____

[11]In his brief, petitioner states that Mr. Packard's report is "unable to claim even a pretense at objectivity or independence" and "is merely the expression of the (decidedly biased) opinion of a career IRS valuation engineer (lacking in requisite credentials and professional accreditation)."

[12]Respondent points to preliminary valuation notes in Mr. Weston's work file, which contain the handwritten notation "Nick wants it Bigger!!" next to a valuation of the Bull Mountain parcel at $2.4 million to $2.7 million.

[13]See Brown v. Se. Pa. Transp. Auth. (In re Paoli R.R. Yard PCB Litig.), 35 F.3d 717, 744-745 (3d Cir. 1994) ("A judge frequently should find an expert's methodology helpful even when
(continued...)

report should be given less weight on the basis that respondent did not assert an increased deficiency.  Petitioner did not provide any support for this argument, and we have found none.

Second, at trial respondent moved to strike from the record Ms. Sant's March 2, 2001, appraisal report and a December 12, 2003, engineer's report by IRS Engineer Lloyd Philip Kinney.[14] We had admitted those reports into evidence, in part, so that petitioner could use them to cross-examine Mr. Packard. Respondent asserts, however, that petitioner never mentioned the reports during cross-examination.  We reserved judgment on the issue in order to obtain a transcript of the cross-examination but will now deny respondent's motion.

We note that petitioner asked Mr. Packard several questions about the exhibits during cross-examination, including:  (1)

---

[13](...continued)
the judge thinks that the expert's technique has flaws sufficient to render the conclusions inaccurate."); Whitehouse Hotel Ltd. Partnership v. Commissioner, 131 T.C. __, __ (2008) (slip op. at 24) ("This and other courts have found that an expert's valuation opinion that does not fully comport with USPAP is still admissible although it may or may not be helpful."); Laureys v. Commissioner, 92 T.C. 101, 129 (1989) ("In the context of valuation cases, we have observed that experts may lose their usefulness (and credibility) when they merely become advocates for the position argued by a party."); Parker v. Commissioner, 86 T.C. 547, 561 (1986) (stating that the Court will consider an expert's qualifications when evaluating his or her expert opinion).

[14]Ms. Sant's report, Exhibit 28-P, provided the basis for petitioner's 2000 Form 8283, and Mr. Kinney's report, Exhibit 27-P, apparently provided a part of the basis for respondent's Feb. 7, 2006, notice of deficiency.

Whether the two reports were in the file that Mr. Packard was provided when he began working on the case; (2) whether Mr. Packard reviewed Ms. Sant's report; (3) whether he reviewed Mr. Kinney's report in a supervisory capacity; and (4) whether and to what extent he relied on Ms. Sant's and Mr. Kinney's reports. Mr. Packard responded that (1) the reports were in the file he received, (2) he reviewed Ms. Sant's report, (3) he did not review Mr. Kinney's report in a supervisory capacity, and (4) he did not rely on either report to any extent, noting that "Had I agreed with the facts and the analyses that were developed in those reports, they would have precluded the need for me to have done one."

III.  Analysis

Respondent allowed $1,992,375 of the $3,100,000 charitable contribution deduction that petitioner claimed for granting the conservation easement over the Bull Mountain and Sylvester parcels.  We must determine whether petitioner is entitled to a larger deduction and, if so, how much larger.  To do so, we must determine the amount of petitioner's charitable contribution, which is generally the fair market value of the conservation easement.  See sec. 1.170A-14(a), (h)(3)(i) and (ii), Income Tax Regs.

Mr. Weston attempted to determine the fair market value of the easement based on the sales prices of comparable conservation

easements; however, he did not "[weigh] this data heavily in [his] analysis due to dissimilarity of the encumbered parcels compared with the subject property." See sec. 1.170A-14(h)(3), Income Tax Regs. We agree with Mr. Weston and find that this data is insufficient to make a conclusion as to fair market value. Accordingly, we must rely on the before-and-after approach, as both Mr. Weston and Mr. Packard have. See id.; see also Stanley Works v. Commissioner, 87 T.C. at 399. To apply the before-and-after approach, we must determine the fair market values of the Bull Mountain and Sylvester parcels before petitioner granted the conservation easement and after. Sec. 1.170A-14(h)(3), Income Tax Regs.

A. Fair Market Value of the Bull Mountain Parcel Before Petitioner Granted the Conservation Easement

1. Mr. Weston's Opinion

Mr. Weston concluded that the Bull Mountain parcel's highest and best use before petitioner granted the conservation easement was residential development in lots ranging in size from 35 to 350 acres. He believed--apparently based on anecdotal real estate agents' comments--that there was significant demand for residential property of that size in the area and noted several selling points, including proximity to a national forest, scenic views, relative seclusion, and abundant wildlife. Moreover, he believed that Gunnison County would have approved the change in the property's use from agricultural to residential.

He relied primarily on the sales comparison approach to determine the fair market value of the Bull Mountain parcel.[15] Under that approach the property being valued is compared with similar properties sold in the same timeframe and geographic area. Schwab v. Commissioner, T.C. Memo. 1994-232. The subject property's fair market value is determined by reference to the sales prices of the comparable properties, adjusted upward to the extent that the subject property is superior to the comparable property in some fashion and downward to the extent it is inferior in some fashion. See Whitehouse Hotel Ltd. Partnership v. Commissioner, 131 T.C. __, __ (2008) (slip op. at 44-45); see also Schwab v. Commissioner, supra ("This approach is based on the principle that the prudent purchaser would pay no more for a property than the cost of acquiring an existing property with the same utility.").

---

[15]Mr. Weston also used the development technique to "test the reasonableness of the direct sales comparison technique" but stated that he had "a greater degree of confidence in the direct comparison technique." The development technique is appropriate where the subject property being valued is "'ripe' for development." Estate of McCormick v. Commissioner, T.C. Memo. 1995-371. Under the development technique, the subject property is treated as if it were subdivided, developed, and sold. Expected proceeds from sales of the subdivided lots are reduced by development costs and discounted over the period during which the lots are expected to sell. See Branch v. Commissioner, T.C. Memo. 1987-321. Using the development technique, Mr. Weston determined that the fair market value of the Bull Mountain parcel was $3,695,265.

For purposes of the sales comparison approach, Mr. Weston's subject property was a 2,412.40-acre piece of land that included both the Bull Mountain and Sylvester parcels. He valued the parcels as one, believing that they had been "assembled together" when petitioner purchased them and that they "can be considered contiguous by virtue of the easements that joined these two parcels".

Mr. Weston considered sales of 12 comparable properties in his analysis, relying heavily on 4 sales, including the October 6, 1999, sale of the Bull Mountain parcel to petitioner for $1,535,000 or $787 per acre. He made adjustments to the sales prices of the comparable properties to--in his view--account for market conditions, location, size, and access. With respect to the October 6, 1999, sale of the Bull Mountain parcel to petitioner, Mr. Weston made two significant positive adjustments, reflecting that the Bull Mountain parcel had appreciated by a prodigious and at first blush implausible 128 percent in the short 14 months between the date petitioner purchased the remote, rural parcel and the date he granted the conservation easement. Mr. Weston's first and most important adjustment was based on his belief that "The value of [the Bull Mountain parcel] * * * was increased significantly by the assemblage with the [Sylvester Parcel] * * * due to improved access." His second adjustment was

due to inflation and improved market conditions during the intervening 14 months.

In his supplemental report Mr. Weston suggested a third reason why the fair market value of the Bull Mountain parcel was higher than the October 6, 1999, sales price; namely, because that sales price may have been below fair market value. In that regard he made the following observation: "Reportedly, Million had been compelled to take title to this portion of the Property after a prior transaction fell through and was as a result highly motivated to sell the Property, even at a discount, due to financial distress."[16]

Ultimately, Mr. Weston determined that the fair market value of the combined subject property was $1,800 per acre. Applying that price per acre to the 1,950 acres of the Bull Mountain parcel, he concluded that its fair market value before petitioner contributed the conservation easement was $3,509,568.

2. Mr. Packard's Opinion

Mr. Packard found that the highest and best use of the Bull Mountain parcel before petitioner granted the conservation easement was continued agricultural and recreational use.

---

[16]Mr. Weston suggested this third adjustment in his Sept. 28, 2007, supplemental report. While discussing generally "Conditions of Sale (Motivation of the Parties)" in his original Mar. 30, 2001, appraisal report, he explicitly chose not to make any adjustment for financial distress for any of the comparable sales included in his original report.

Although he believed that residential development in lots of 35 acres or more was legally permissible, physically possible, and financially feasible, he did not think it was the "maximally productive use" of the property because of the limited demand for residential lots in the area, as reflected by "limited demand for developable lands" in the area.

Mr. Packard relied on the sales comparison approach to determine the fair market value of the Bull Mountain parcel. He used the Bull Mountain parcel itself as the subject property and compared it with nine comparable properties, making adjustments for access, size, water rights, tree cover, and market conditions. He placed great reliance on the October 6, 1999, sale of the Bull Mountain parcel to petitioner and one other sale. His only adjustment to the October 6, 1999, sales price of the Bull Mountain parcel was a positive adjustment because "properties were generally increasing in value" during the 14 months between the sale and petitioner's grant of the easement.

Mr. Packard ultimately determined that the fair market value of the Bull Mountain parcel before petitioner granted the conservation easement was $875 per acre or $1,710,000 after rounding. This value reflects that the Bull Mountain parcel appreciated in value by 11 percent.

3.  Discussion

To determine the fair market value of the Bull Mountain parcel, both experts used the sales comparison approach, relying heavily on the October 6, 1999, sale of the parcel to petitioner. We think that this was the appropriate approach to take. After all, the best evidence of fair market value is a recent sale of the property at issue. See Wortmann v. Commissioner, T.C. Memo. 2005-227 ("we find that the most persuasive evidence of the subject property's value as of the contribution date is the actual sale of the subject property 17 months before the contribution"). For the purposes of our analysis, we will focus on the October 6, 1999, sale.[17]

There are three major issues that divide the experts. First, they do not agree whether there was demand for residential property in the area. Second, they do not agree that the Bull Mountain parcel's access was improved after petitioner purchased the Sylvester parcel. Third, they do not agree that petitioner purchased the Bull Mountain parcel at a discount due to the seller's financial distress. Each of these issues has a significant effect on the fair market value of the Bull Mountain parcel, and we will address each separately.

---

[17]Because we will not consider other comparable properties in our analysis, we need not address the parties' disputes over other adjustments, such as adjustments due to location, size, and water rights.

i. <u>Demand for Residential Property</u>

The demand for residential property in the Bull Mountain parcel's neighborhood is an important consideration because it affects the parcel's highest and best use and because high demand for residential property would suggest a higher fair market value.

Although Mr. Weston acknowledged, in his March 30, 2001, report, that "To date there has not been a significant amount of development in this part of Gunnison County", he indicated that "The northwestern portion of Gunnison County is beginning to see an increase in demand for vacant land suitable for development" and that "property values are appreciating rapidly at the present time."  Despite his statement that "This growth is not explosive, however", he projected that demand was so high that if the Bull Mountain parcel were subdivided into 39 parcels of 35 acres or more, the subdivided parcels could have been sold within 5 years. Citing local realtors, he concluded that there was "strong demand for residential sites of this size and character in the current market" and that "The lack of sales activity involving smaller parcels in this area is due entirely to a lack of supply."[18]

_____

[18]In her report, Ms. Sant also concluded that demand for residential property in the area was high:  "Prices are increasing and demand is moderate to strong.  The difficulty in this area is the lack of available smaller acreage parcels. * * * The subject due to its location and physical characteristics is well suited and desirable for residential use

(continued...)

Mr. Packard found to the contrary, noting simply that "If demand for residential parcels was strong, it is reasonable to expect that a developer would have shown interest in [the Bull Mountain parcel]."  He stated that "There is little, or no, residential development activity in the market area of the subject property" and "While there are isolated small-acreage land purchases that have occurred for the purpose of building a home, there has been no planned development of large parcels."

Based on the evidence before us we find that there was little to no demand for residential property of the type suggested by Mr. Weston at the time petitioner granted the conservation easement.  In addition, we do not see a trend of increasing demand at that time, either.  Mr. Weston's assertions otherwise lack evidentiary support.

The experts did acknowledge that the property to the Bull Mountain parcel's east--property owned by Eck and adjacent to State Highway 133--was divided into twelve 35-acre residential parcels and sold from 2002 through 2006.  That evidence and the prolonged 4-year absorption rate does not persuade us that there was significant demand for that type of property, even with

---

[18](...continued)
and is a convenient drive time from Carbondale."  We note, however, that reaching Carbondale requires one to traverse McClure Pass, the summit of which is 8,755 feet.  This is not high by Colorado standards but would be a problem or cause a delay on snowy days.

relatively good access, in 2000.  First, the Eck sales occurred after the valuation date in this case, and we are therefore limited in our consideration of them.[19]  Second, even if we could consider those sales, they reflect much lower demand than Mr. Weston has suggested.  Specifically, although Mr. Weston indicated that thirty-nine 35-acre-or-more residential parcels could be sold within 5 years, it apparently took Eck 4 years to sell just twelve 35-acre parcels with better access and a comparable nearby location.

Mr. Weston has also noted the existence of smaller lots, including some of less than 1 acre, to the north of the Bull Mountain parcel.  Although those lots may exist, there is no evidence that they had been sold or even offered for sale at the time petitioner granted the conservation easement.  Accordingly, they do not support Mr. Weston's claims regarding demand.

Because we conclude that there was limited demand for residential property in the Bull Mountain parcel's neighborhood around the time petitioner granted the easement, we also conclude that the highest and best use of the Bull Mountain parcel before

---

[19]See Estate of Spruill v. Commissioner, 88 T.C. 1197, 1228 (1987) ("It is well settled that, in examining all the relevant facts and circumstances, events occurring subsequent to the valuation date are not considered in determining fair market value, except to the extent that such events were reasonably foreseeable on the valuation date".).

petitioner granted the easement was continued agricultural and recreational use.[20]

    ii.  <u>Access to the Bull Mountain Parcel</u>

Both experts agree that the Bull Mountain parcel did not have ideal access to public roads when petitioner purchased it on October 6, 1999. The road to Highway 133 was long and rough, and the Bull Mountain parcel's easement over McIntyre's property to access County Road 265, which was a gravel road not always plowed in the winter,[21] was limited to agricultural purposes. Mr. Weston asserts, however, that when petitioner purchased the Sylvester parcel, the agricultural restriction over McIntyre's property was lifted. In his words: "there was created a much better and unrestricted access route that led from County Road 265 all the way down into the larger Bull Mountain Ranch tract." Based predominantly on this belief and the synergy created by the assemblage of the two parcels, he determined that the Bull

_____

[20]Because the highest and best use of the parcel was not residential development, the development technique for valuing it is not appropriate. As a result, we will disregard Mr. Weston's development technique analysis as well as the experts' and parties' disputes over how that technique was applied. But had we considered it and factored in realistic development costs and access problems together with a realistic absorption rate, it would not have materially affected our valuation of the conservation easement.

[21]Gunnison County Public Works Department, Gunnison County, Colorado County/Plowed Roads Numerical List 2 (last viewed 2009).

Mountain parcel more than doubled in value after petitioner purchased the Sylvester parcel.

Mr. Weston, who is not an attorney, never fully explained how the agricultural restriction was lifted; and when asked during cross-examination, he acknowledged that he was "probably * * * not qualified to have that opinion." Apparently, he believed that petitioner could cross McIntyre's property using the Sylvester parcel's unrestricted easement even if petitioner was traveling to and from the Bull Mountain parcel.

There is no discernable legal support for Mr. Weston's position. Under Colorado law "an easement holder may not use [an] easement to benefit property other than the dominant estate." Lazy Dog Ranch v. Telluray Ranch Corp., 965 P.2d 1229, 1238 (Colo. 1998) (citing 1 Restatement, Property 3d (Servitude), sec. 4.11); WRWC, LLC v. City of Arvada, 107 P.3d 1002, 1005 (Colo. Ct. App. 2004). In Lazy Dog Ranch, the Colorado Supreme Court cited the Restatement, which states that "unless otherwise provided, an appurtenant easement cannot be used to serve property other than the dominant estate. The rationale is that use to serve other property is not within the intended purpose of

the servitude."[22]  1 Restatement, Property 3d (Servitude), sec. 4.11, cmt. b. (2000).

Here, the unrestricted easement over McIntyre's property is appurtenant to the Sylvester parcel.  In that regard, the benefit of the easement passed from the parcel's previous owners to petitioner when he bought the parcel.  In addition, the Sylvester parcel is the dominant estate with respect to the easement because it is the property that is benefited by it.  Accordingly, Colorado law would prohibit petitioner from using the Sylvester parcel's unrestricted easement to benefit property other than the Sylvester parcel.  Lazy Dog Ranch v. Telluray Ranch Corp., supra at 1238; 1 Restatement, supra sec. 4.11.  This is true even though petitioner owned both the Bull Mountain and Sylvester parcels.  1 Restatement, supra sec. 4.11.[23]

---

[22]The Colorado Supreme Court defined some of the key terms as follows:

> An easement is said to be "appurtenant" to property when the benefit or burden of the easement "runs with" an interest in property.  Owners of the property are entitled to the benefit, or subject to the burden, of the easement due to their relation to the property. Thus, when their property interest terminates, so does their connection to the easement.  * * *  The property burdened by the easement is customarily known as the "servient estate," while the property benefited by the easement is called the "dominant estate." * * *

Lazy Dog Ranch v. Telluray Ranch Corp., 965 F.2d 1229, 1234 (Colo. 1998).

[23]As an example, if a hotel owner purchases a lot in an
(continued...)

What this means is that the Bull Mountain parcel's access over McIntyre's land was still limited to agricultural purposes even after petitioner purchased the Sylvester parcel. Consequently, for this and other reasons, Mr. Weston's large positive adjustment to the Bull Mountain parcel's fair market value due to improved access is unwarranted.[24]

A second consequence of our access analysis is that Mr. Weston was wrong to have valued the Bull Mountain and Sylvester parcels as a single property. Presumably Mr. Weston believed that once petitioner owned both parcels, he could string the parcels' easements together to provide access between them, thus assembling the parcels or rendering them contiguous.[25] As

---

[23](...continued)
adjacent subdivision and that lot holds an easement appurtenant allowing it rights to use a community beach and recreational facilities, the hotel owner is not entitled to use the beach or the facilities for the benefit of its hotel operation. 1 Restatement, Property 3d (Servitude), sec. 4.11, ill. 1 (2000). In an even more extreme example, if an individual purchases two adjoining parcels of land, one of which includes the benefit of an appurtenant easement over another parcel, and builds a house which straddles the borders of those two parcels, the individual is not entitled to use the easement for access to the part of the house built on the other parcel of land. Id. ill. 2.

[24]In any event, even if access to the Bull Mountain parcel was no longer limited to agricultural use, given our determination that the parcel's highest and best use was agricultural and recreational, any positive adjustment to its fair market value would have been much smaller than Mr. Weston's adjustment.

[25]Mr. Weston also cited "the concept of unity of use" to explain why the Bull Mountain and Sylvester parcels could be
(continued...)

explained above, this was not permissible.  See Lazy Dog Ranch v. Telluray Ranch Corp., supra at 1238.

The Bull Mountain and Sylvester parcels are two separate properties, separated from each other by a quarter mile.  In fact, the parties stipulated that the parcels are not contiguous, and even the conservation easement documents that petitioner signed refer to the parcels as "two legally distinct and separately deeded properties."  For the reasons above, the Bull Mountain and Sylvester parcels should have been valued separately.[26]

---

[25](...continued)
considered a single property despite the fact that they are not contiguous.  We note that in condemnation cases "Three factors are particularly helpful in ascertaining whether property taken is part of a single, larger tract:  physical contiguity, unity of ownership, and unity of use."  United States v. 8.41 Acres of Land, 680 F.2d 388, 393 (5th Cir. 1982).  We are not persuaded that unity of use is a relevant concept in the case before us.  Moreover, other than some possible savings in marketing costs, we do not perceive that development costs would be markedly reduced given the need for separate roads and utilities for the disparate parcels.  We therefore reject Mr. Weston's analysis on this point.

[26]There is yet another reason why the Bull Mountain and Sylvester parcels should have been valued separately.  By valuing the two parcels together and allocating the combined price per acre to the Bull Mountain parcel, Mr. Weston factored the attributes of the Sylvester parcel into his determination of the Bull Mountain parcel's fair market value.  This may have distorted his ultimate determination of the fair market value of the Bull Mountain parcel.  This is particularly problematic here because the Sylvester parcel was treated separately under sec. 170(e)(1)(A), leaving only the question of the Bull Mountain parcel's value.

(continued...)

### iii.  Evidence of a Discounted Sales Price in 1999

Mr. Weston suggested in his supplemental report that the Bull Mountain parcel's $1,535,000 sales price may have been a discounted price due to the financial distress of its seller, Million.  There is insufficient evidence to support that suggestion.

At trial Mr. Weston admitted that he did not speak with Million's managing partner, Aaron Million, about any financial distress that Million may have been experiencing.  Mr. Weston appears to have based his suggestion on the fact that the Bull Mountain parcel "had been listed for sale at a higher asking price for years" and that the price was lowered in the year before petitioner purchased it.

In his testimony before the Court, Mr. Million acknowledged that the Bull Mountain parcel had been on the market for years and that its sales price had been lowered.  He noted that the

---

[26](...continued)

A simple, albeit extreme, example can illustrate this point. Assume that Goldacre is a 10-acre property with vast gold deposits and a fair market value of $1,000 ($100 per acre) and that Blackacre is a 10-acre property with no redeeming qualities and a fair market value of $100 ($10 per acre).  Valued together Goldacre and Blackacre are still very valuable, with a fair market value of around $1,100 ($55 per acre), because of Goldacre's gold deposits.  If the fair market value of Blackacre alone is determined by allocating the joint value of $55 per acre to Blackacre, then the fair market value of Blackacre would be $550.  That result factors Goldacre's gold deposits into Blackacre's fair market value, resulting in a large distortion from its actual fair market value of $100.

parcel had been on the market on a for-sale-by-owner basis for some time before he listed it with a real estate agent. It was listed for 6 to 8 months, and at least three offers for parts of the parcel were received, before petitioner purchased it. Mr. Million also testified that he had moved to Fort Collins, Colorado, 2 years before the sale of the Bull Mountain parcel to petitioner. He testified, however, that he was not under "duress" or "financial compulsion" when petitioner purchased the parcel.

Mr. Lario, the real estate agent who worked with Mr. Million to sell the parcel, testified that Million's motivation to sell the property may have increased after Mr. Million moved out of the area. However, he also stated that he had no reason to think that the sales price of the parcel to petitioner did not reflect its fair market value.

On this evidence we cannot conclude that Million sold the Bull Mountain parcel to petitioner at a discount or that any positive adjustment is warranted with respect to the sales comparison approach. The fact that the Bull Mountain parcel was on the market for several years and that its asking price was lowered is just as likely an indication that demand for the parcel was limited as it is some reflection of financial distress.

4.  Conclusion as to the Fair Market Value of the Bull Mountain Parcel Before Petitioner Granted the Conservation Easement

We have determined that the October 6, 1999, sales price should serve as the basis for determining the fair market value of the Bull Mountain parcel before petitioner granted the conservation easement.  We have further determined that that sales price should not be adjusted upward, as Mr. Weston asserted, because of improved access or because the parcel was sold to petitioner at a discount.  We agree with both experts, however, that a positive adjustment should be made because properties in the Bull Mountain parcel's neighborhood were generally increasing in value between the time petitioner purchased the parcel and when he granted the conservation easement.  Mr. Weston assumed a "very conservative appreciation rate of 5% per year" while Mr. Packard's ultimate conclusion reflects 11-percent appreciation.  Based on the evidence of record we find that an 11-percent positive adjustment is generous but reasonable.  We therefore find that the fair market value of the Bull Mountain parcel before petitioner granted the conservation easement was $1,710,000.

B.  The Fair Market Value of the Sylvester Parcel Before Petitioner Contributed the Conservation Easement

The experts disagree on the fair market value of the Sylvester parcel before petitioner granted the conservation easement.  Mr. Weston determined that it had appreciated in value

to $832,752 from its $671,350 sales price 2 months earlier. Nevertheless, because of the restrictions imposed by section 170(e)(1)(A), he used $671,350 in his easement valuation. Mr. Packard determined that the parcel had not appreciated in value and was still worth $671,350. We agree with Mr. Packard that $671,350 reflects the parcel's fair market value before petitioner granted the easement. As explained below, however, even if this parcel had marginally appreciated 1 or 2 percent based on an 11-percent-per-year appreciation rate, our ultimate conclusion as to the amount of petitioner's charitable contribution with respect to the Sylvester parcel would be unchanged because of section 170(e)(1)(A).

Because the Sylvester parcel did not appreciate in value between the date petitioner purchased the parcel and the date he granted the conservation easement, section 170(e)(1)(A) does not apply. The amount of petitioner's contribution with respect to the Sylvester parcel is therefore the fair market value of the conservation easement, which is in turn equal to the difference between the fair market value of the parcel before petitioner granted the easement ($671,350) and its fair market value afterwards. See sec. 1.170A-14, Income Tax Regs. Put another way, the amount of the contribution is the fair market value before petitioner granted the easement reduced by the percentage diminution in the parcel's fair market value caused by the

easement.  See, e.g., <u>Griffin v. Commissioner</u>, T.C. Memo. 1989-130 ("Our evaluation of the totality of the evidence supports a value for the easement of 20 percent of the $350,000 'before' value of the property, or $70,000.").

Accordingly, the amount of petitioner's charitable contribution with respect to the Sylvester parcel is exactly the same regardless of whether the parcel appreciated in value or not.[27]  Either way, the operative number is $671,350, which we will reduce by the percentage diminution in the Sylvester parcel's fair market value.

  C.  <u>The Fair Market Values of the Bull Mountain and Sylvester Parcels After Petitioner Granted the Conservation Easement</u>

  1.  <u>Mr. Weston's Opinion</u>

Mr. Weston determined that the fair market value of the Bull Mountain and Sylvester parcels was diminished by 70 percent because of the conservation easement.  In reaching this conclusion he considered the diminution in value caused by conservation easements over six similar properties.  He determined that the diminution in value of those properties ranged from 48 to 70-80 percent.  In comparing the Bull Mountain and Sylvester parcels with those other properties, a critical

---

[27]If the Sylvester parcel had depreciated, we would have used the depreciated value in our calculation.  See sec. 1.170A-14, Income Tax Regs.  However, there is no evidence, and neither expert suggests, that the parcel depreciated.

factor was the extent to which the easement restricted the use of the property. He believed that the highest and best use of the Bull Mountain and Sylvester parcels before petitioner granted the easement was residential development and that the parcels were limited to agricultural and recreational use after the easement. He therefore concluded that "Due to the restrictive nature of the subject conservation easement we are more confident at the higher end of the range of diminution." He provided the following explanation in his September 28, 2007, supplemental report:

> If the [Bull Mountain and Sylvester parcels] * * * had been divided into 35-acre parcels, 68 separately conveyable homesites could have been created, and if it had been divided into 50-acre parcels (consistent with our highest and best use conclusion), 48 separately conveyable homesites could have been created. In any event, density has been reduced by 95% to 97%. The Easement, based on our analysis, caused a significant diminution in the fair market value of the Bull Mountain Ranch.

Mr. Weston supported his conclusion using the sales comparison approach and comparing the parcels after petitioner contributed the easement directly with other properties encumbered by conservation easements. The comparison resulted "in a range in value for the entire 2,412.40-acre subject property of between $964,960-$1,688,680, bracketing our conclusion of value developed by the percentage diminution technique."

2.  <u>Mr. Packard's Opinion</u>

Mr. Packard determined that the conservation easement diminished the fair market values of the Bull Mountain and Sylvester parcels by 0 to 10 percent.  Like Mr. Weston, he considered the diminution in value caused by conservation easements over comparable properties.  Also like Mr. Weston, he paid particular attention to the restrictiveness of the easements and whether they changed the highest and best use of the properties.  In his words:  "The goal in analyzing an easement encumbered property sale is to estimate the loss in value attributable to the change in highest and best use resulting from the conservation easement and reflected by the easement encumbered sale price."  He indicated that when using that method "The need to adjust for location differences is eliminated, because the diminution in value is expressed as a percentage."

In his report Mr. Packard included a chart that he referred to as "the matrix".  The matrix incorporated information from 35 easement-encumbered properties and illustrated generally that the amount of diminution caused by an easement is related to the degree to which the easement changes a property's highest and best use.  According to Mr. Packard, the matrix showed that the diminution in value "for those properties that did not experience a change in highest and best use * * * is quite small and was often found to be 0%".

In addition, Mr. Packard selected seven specific properties from the matrix to compare with the Bull Mountain and Sylvester parcels.  Because Mr. Packard believed that the highest and best use of the parcels before and after petitioner contributed the easement was agricultural and recreational use, he chose comparable properties that did not show any change in highest and best use.  After analyzing the comparables, he determined that the fair market values of the parcels were diminished by 0 to 10 percent because of the easement.

Finally, Mr. Packard noted that there were no comparable arm's-length sales of easement-encumbered properties in Gunnison County but that a similar sale involving subdivision covenants resulted in no diminution in value.

3.  Analysis

There are fundamental problems with both experts' opinions.[28]  Mr. Weston's conclusion of 70-percent diminution is premised on his belief that the highest and best use of the Bull Mountain and Sylvester parcels before petitioner granted the easement was residential development.  We found above that the highest and best use of the Bull Mountain parcel was actually continued agricultural and recreational use, and for the same

---

[28]In light of the fundamental problems and because of the conclusions discussed below, we need not dwell further on the more specific problems raised by the experts with respect to the methods and comparable properties used in their respective analyses.

reason we find that the highest and best use of the Sylvester parcel is also continued agricultural and recreational use. Therefore, the development restrictions imposed by the easement had much less effect on the parcels' use than Mr. Weston has suggested and would not warrant a 70-percent diminution in value.[29]

Moreover, given our conclusions as to the fair market values of the Bull Mountain and Sylvester parcels ($1,710,000 and $671,350, respectively), even with 70-percent diminution in value the amount of petitioner's charitable contribution would not exceed the $1,992,375 deduction that respondent has already allowed.

With respect to Mr. Packard, we disagree with his conclusion that the conservation easement may have had no, or only a nominal, impact on the fair market values of the Bull Mountain and Sylvester parcels.[30]  See Schwab v. Commissioner, T.C. Memo. 1994-232 ("We find it hard to imagine a prospective purchaser of a 1,558-acre parcel of land who would not have considered the

_____

[29]We note as well that Mr. Weston's report lacks critical information about the comparable properties he considered; namely the highest and best use of the properties before they were encumbered by conservation easements.  Without this information it is impossible to tell how much effect the easements had on the properties' fair market values.

[30]We also disagree with Mr. Packard's use of the matrix. Because it included general information that did not have a specific connection to the Bull Mountain and Sylvester parcels, we afforded it little weight in our analysis.

restrictions of the open-space easement in determining the price."). Further, he failed to consider two important factors.

First, for tax years beginning on or after January 1, 2000, the State of Colorado allows a State income tax credit for taxpayers who grant a qualified conservation easement on real property located in Colorado. Colo. Rev. Stat. sec. 39-22-522(2) (2000). At the time petitioner granted the conservation easement, the maximum credit allowed was $100,000 per donation. Id. sec. 39-22-522(4)(a). Any unused portion of the credit could generally be carried forward for a maximum of 20 years. Id. sec. 39-22-522(5)(a). In addition, subject to certain limitations, the taxpayer could transfer all or a portion of the credit to another taxpayer. Id. sec. 39-22-522(7). Generally, the credit a taxpayer could use was limited to the net tax liability reported during the tax year; however, if State revenue exceeded certain thresholds, a taxpayer could "elect to have the amount of the credit not used as an offset against income taxes in said income tax year refunded to the taxpayer." Id. sec. 39-22-522(5)(b)(I).

Mr. Packard disregarded the value of the Colorado State income tax credits. By granting the conservation easement over the Bull Mountain and Sylvester parcels, petitioner precluded any future purchasers from granting a conservation easement and thus from receiving the benefit of the tax credits. This should have

been at least considered in determining the parcels' diminution in fair market value. At trial Mr. Packard tried to explain his lack of attention to the State credits by noting that the market was generally not yet sophisticated enough to recognize the potential value of the credits or factor them into fair market value. We reject his explanation, which was based on the state of the market at that time. For purposes of determining fair market value, we must consider a hypothetical sale between a willing buyer and a willing seller both having a reasonable knowledge of relevant facts. See Arbor Towers Associates, Ltd. v. Commissioner, T.C. Memo. 1999-213; sec. 1.170A-1(c)(2), Income Tax Regs.

Second, Mr. Packard has seemingly neglected the possibility that circumstances may change in the future. For example, although there was little demand for residential property at the time petitioner granted the easement, residential development may be a realistic possibility in the future. In that event, the conservation easement would nevertheless prevent petitioner or his successors in interest from taking advantage of potentially lucrative development opportunities. Mr. Packard should have at least considered this possibility in his report and, if

appropriate, reflected it in the diminution in value of the Bull Mountain and Sylvester parcels' fair market values.[31]

In sum, Mr. Weston's determination of 70-percent diminution is too high and Mr. Packard's determination of 0- to 10-percent diminution is too low. The correct percentage lies somewhere in between; however, because of our conclusions with respect to the fair market values of the Bull Mountain and Sylvester parcels, no diminution in that range will lead to a larger deduction than respondent has already allowed.

IV. Conclusion

Based on a thorough review of the evidence in this case, we concluded that the fair market values of the Bull Mountain and Sylvester parcels before petitioner granted the conservation easement were $1,710,000 and $671,350, respectively. When petitioner granted the conservation easement, the fair market values of the parcels diminished, entitling him to a deduction. They did not diminish so much, however, that petitioner is

---

[31]Mr. Packard tried to explain that these two factors are of minimal importance "in the real world", but we are not persuaded.

To the extent future demand for residential development could have been anticipated, any increase in fair market value due to such demand would have had to have been discounted under time value of money principles. There is no evidence that there will be significant demand for residential development in the area surrounding the Bull Mountain and Sylvester parcels in the near to intermediate future. Accordingly, in light of the necessary discount for the time value of money, the possibility of future residential development does not affect our conclusion as to the value of the conservation easement.

entitled to a deduction larger than that which respondent has already allowed.  Accordingly, we sustain the deficiency determined by respondent.

The Court has considered all of petitioner's contentions, arguments, requests, and statements.  To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

To reflect the foregoing,

Decision will be entered

for respondent.